UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

SUNBIT, INC.,

    Plaintiff,

vs.

KATHIE KEIL, SYNCHRONY
FINANCIAL, and CARECREDIT LLC,

    Defendants.

——————————————/

Case No.

Preliminary and Permanent Injunctive
Relief Requested

Declaratory Relief Requested

Demand for a Jury Trial

## VERIFIED COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND OTHER RELIEF

Plaintiff Sunbit, Inc. ("Sunbit"), by and through its undersigned counsel, hereby brings this action against Defendants Kathie Keil ("Keil"), Synchrony Financial ("Synchrony"), and CareCredit LLC ("CareCredit"), and alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Sunbit is a technology company operating in the consumer financing space, providing point-of-sale consumer financing solutions in a variety of sectors across the United States, including in the health and wellness sector to healthcare providers, such as dental practices and dental service organizations ("DSOs"), and their patients.

2. At all times relevant herein, Sunbit was and is a foreign corporation organized and existing under the laws of the State of Delaware with its principal place of business in Los Angeles, California.

3. Keil is an individual who, upon information and belief, worked for CareCredit as a Practice Development Manager from February 2016 through October

2022. Keil then worked for Sunbit as a Dental Key Account Manager from October 2022 to September 2024, a Senior Key Account Manager from September 2024 to February 2025, and a Regional Key Account Manager from February 2025 to February 2026. Upon information and belief, Keil returned to CareCredit/Synchrony in late February or early March 2026.

4. At all times relevant herein, upon information and belief, Keil was and is a citizen of Florida and resides in Brandon, Hillsborough County, Florida.

5. Synchrony is a consumer financial services company that also offers consumer financing solutions in a variety of sectors, including health and wellness. CareCredit is a subsidiary of Synchrony and a branded credit card offered by Synchrony. CareCredit provides a point-of-sale consumer financing solution that directly competes with Sunbit in the healthcare consumer financing space, including in the dental vertical market.

6. At all times relevant herein, upon information and belief, Synchrony was and is a foreign corporation organized and existing under the laws of Delaware with its principal place of business in Stamford, Connecticut.

7. At all times relevant herein, upon information and belief, CareCredit was and is a foreign limited liability company organized and existing under the laws of California with its principal place of business in Costa Mesa, California.

8. The Court has original subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as Sunbit's claims arise under federal law, including the Defend Trade Secrets Act (18 U.S.C. § 1836, *et seq.*) (the "DTSA").

9.     The Court has supplemental jurisdiction over any related state law claims in this dispute pursuant to 28 U.S.C. § 1367 because the claims are substantially related to Sunbit's federal claims.

10.     The Court has personal jurisdiction over Keil because she is a resident of the State of Florida, resides in this judicial district, and performed the acts giving rise to the claims at issue in this judicial district.

11.     The Court has personal jurisdiction over Synchrony because Synchrony and CareCredit conduct substantial and continuous business operations in the State of Florida, have employed Keil in the State of Florida, and have committed tortious acts in the State of Florida giving rise to the claims at issue.

12.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Keil resides in this judicial district, Synchrony and CareCredit are subject to personal jurisdiction in this district, and a substantial part of the events giving rise to the claims at issue occurred in this judicial district.

13.     Pursuant to Local Rule 1.04(a)-(b), the Tampa Division is proper for this action because it is the division encompassing Hillsborough County.

**FACTUAL ALLEGATIONS**

**A.     Sunbit's Business**

14.     Sunbit is a technology-driven consumer financing company that provides point-of-sale lending solutions in a variety of sectors, including to patients of healthcare providers, including dental practices and DSOs, enabling patients to finance the out-of-pocket costs of certain health and wellness services.

3

15.    Sunbit's business model in the health and wellness space relies on healthcare providers choosing to inform and educate their patients about Sunbit's products.  When a patient presents at a provider's office for services, the provider's staff may introduce financing options, including Sunbit's products.  If the patient elects to finance their services through Sunbit and is approved, the patient is immediately able to apply the funds to the services required, and the healthcare provider is paid for the services, minus a fee, within a matter of days.  Sunbit services the loan opened by the patient.

16.    The success of Sunbit's business model depends on healthcare providers and their staff being knowledgeable about Sunbit's financing options, including features, promotions, and application procedures; having marketing and informational materials available; and being motivated to offer patients information about and access to Sunbit's products so that patients seriously evaluate its financing options.

17.    Healthcare providers often have multiple different competing consumer financing options available to their patients.  Thus, to be able to compete against the other options that the providers and patients may have, which often include Synchrony products like CareCredit, Sunbit develops relationships with the healthcare providers to educate, train, and support them so that Sunbit's products are favorably and knowledgeably offered to patients where appropriate.

18.    Sunbit invests significant resources, time, and money into research, business development, market analysis, marketing and advertising, training, and

4

relationship building with current and potential healthcare provider customers.

19.    Sunbit has developed and maintains confidential, proprietary, and trade secret information, including but not limited to: existing, upcoming, and prospective merchant and customer lists; product pricing, features, and the performance of those features; sales and marketing strategies; business plans and major business initiatives; financial forecasts and historical financial data; pricing methodologies and cost data; algorithms and software codes; customer and supplier information; employee information; and other proprietary business information.  Each of the foregoing categories of information was developed by Sunbit at significant expense over years of business operations, was not publicly available, and would provide measurable competitive advantage to a competitor who obtained it, eliminating the need for that competitor to invest the time and resources necessary to independently develop such information.

20.    Sunbit derives independent economic value from the fact that its confidential, proprietary, and trade secret information is not generally known to the public and not readily ascertainable through proper means.  Sunbit has taken, and continues to take, reasonable measures to keep that information secret and confidential.

21.    These measures include, but are not limited to, password-protecting its information systems, limiting the dissemination of Confidential Information (as defined in Exhibit 1, *infra*) to certain employees on a need-to-know basis, promulgating policies governing access to and the handling and use of such information through its

Employee Handbook and IT Acceptable Use Statement, requiring employees to sign Confidential Information and Invention Assignment Agreements, and monitoring and controlling access to its information systems.

22.    If Sunbit's proprietary, confidential, and trade secret information were provided to a competitor or used by Keil to compete with or impair Sunbit's business, it would cause loss of competitive advantage and irreparable harm to the business interests, reputation, and goodwill of Sunbit.

B.    **Keil's Employment with Sunbit**

23.    On or about October 3, 2022, Sunbit extended an offer of employment to Keil for the position of Dental Key Account Manager, as set forth in her Offer of Employment dated October 3, 2022 (the "Employment Letter").  Keil accepted the Employment Letter by signing it on October 4, 2022.  A true and correct copy of the Employment Letter and incorporated Agreement is attached as **Exhibit 1**.

24.    As a condition of her employment, Keil was also required to sign Sunbit's Confidential Information and Invention Assignment Agreement, dated October 3, 2022 (the "Agreement"), which was incorporated as Exhibit A to the Employment Letter.  Keil signed the Agreement on October 4, 2022.

25.    Over the course of her approximately three and a half years of employment with Sunbit, Keil held the positions of Dental Key Account Manager, Senior Key Account Manager, and Regional Key Account Manager, responsible for increasing the number of healthcare providers offering Sunbit's products, how frequently and knowledgeably those providers informed and educated their patients

6

about Sunbit's products, application velocity, and loan volume.

26.    In her role, Keil was responsible for, among other things: owning and growing a defined book of business across dental practices and DSOs; building long-term relationships with key decision makers, including practice owners, DSOs, office managers, treatment coordinators, and front-office teams; leading recurring performance reviews using practice data; delivering high-impact training and coaching for office teams; collaborating cross-functionally with internal teams; executing territory plans; and maintaining CRM management to support forecasting and business visibility.

27.    Keil's covered region included Florida and Georgia as its larger markets, and she had direct responsibility for Sunbit's customer relationships, business strategies, and confidential commercial information within that territory.

28.    During her employment, Keil had access to a significant volume of Sunbit's trade secrets and Confidential Information, including but not limited to: (a) Sunbit's existing, upcoming, and prospective merchants; (b) product pricing, features, and the performance of those features; (c) major business initiatives, including a recent confidential initiative in the dental sector which involved a comprehensive revamp of Sunbit's business strategy, pricing, targets, and materials; (d) sales and marketing strategies for the southeast region; (e) customer lists and customer-specific account information; and (f) competitive intelligence and market data.

29.    Keil was also involved in piloting new offerings, including new features and pricing structures, with many merchants, giving her hands-on experience with and

detailed knowledge of Sunbit's proprietary products and strategies prior to their broader rollout.

30.    Additionally, Keil signed and acknowledged Sunbit's Employee Handbook on April 2, 2024, which reinforced the duty to maintain strict confidentiality of Sunbit's nonpublic, confidential, and proprietary information, including trade secrets, and provided notice under the Defend Trade Secrets Act (as did Section 2(e) of the Agreement).  A true and correct copy of an excerpt of the Employee Handbook is attached hereto as **Exhibit 2**.

31.    Keil further signed and acknowledged Sunbit's IT Acceptable Use Statement on October 17, 2022, which set out her responsibilities regarding the use of Sunbit's information systems and the protection of confidential information.  A true and correct copy of the IT Acceptable Use Statement is attached hereto as **Exhibit 3**.

C.    **Keil's Contractual Obligations**

32.    As is pertinent here, Section 9 of the Employment Letter includes a covenant not to compete, which provides in relevant part:

> For a period of one (1) year immediately following the termination of your employment with the Company, **you will not, for yourself or on behalf of any other person or business enterprise, engage in any business activity within the State of Florida which competes with the Company**.  By accepting this offer of employment, you hereby acknowledge (1) that the Company will suffer irreparable harm if you breach your obligations under this paragraph; and (2) that monetary damages will be inadequate to compensate the Company for such a breach. Therefore, if you breach your obligations under this paragraph, then the Company shall be entitled to injunctive

8

relief, in addition to any other remedies at law or equity, to enforce the provisions of this paragraph.

(emphasis added).

33.    Section 8 of the Employment Letter further provides that, as a condition of employment, Keil was required to sign Sunbit's standard Confidential Information and Invention Assignment Agreement to protect the interests of the Company.

34.    Under Section 2(a) of the Agreement, Keil agreed:

at all times during the term of the Relationship and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company to the extent necessary to perform [her] obligations to the Company under the Relationship, and not to disclose to any person, firm, corporation or other entity, without written authorization from the Company in each instance, any Confidential Information.

35.    Under Section 2(b) of the Agreement, "Confidential Information" is broadly defined to include, without limitation:

technical data, trade secrets, know-how, research, product or service ideas or plans, software codes and designs, algorithms, developments, inventions, patent applications, laboratory notebooks, processes, formulas, techniques, biological materials, mask works, engineering designs and drawings, hardware configuration information, agreements with third parties, lists of, or information relating to, employees and consultants of the Company (including, but not limited to, the names, contact information, jobs, compensation, and expertise of such employees and consultants), lists of, or information relating to, suppliers and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the Relationship), price lists, pricing methodologies, cost data, market share data, marketing plans, licenses, contract information, business plans, financial forecasts, historical financial data, budgets or

9

other business information disclosed to me by the Company either directly or indirectly, whether in writing, electronically, orally, or by observation.

36. Under Section 4 of the Agreement, Keil acknowledged her lack of "expectation of privacy with respect to Sunbit's telecommunications, networking or information processing systems (including, without limitation, files, e-mail messages, and voice messages) and that [her] activity and any files or messages on or using any of those systems may be monitored or reviewed at any time without notice."

37. Keil also agreed that upon termination she would return Sunbit information, agreeing:

> [She] will deliver to the Company (and will not keep in [her] possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, laboratory notebooks, materials, flow charts, equipment, other documents or property, or reproductions of any of the aforementioned items developed by [her] pursuant to the Relationship or otherwise belonging to the Company, its successors or assigns.

38. Under Section 5 of the Agreement, Keil agreed to sign and deliver the Termination Certification attached to the Agreement upon termination of her employment, which reiterated certain continuing obligations under the Agreement.

39. Under Section 6 of the Agreement, Keil agreed that during the defined Restriction Period she would "inform any entity or person with whom [she] may seek to enter into a business relationship (whether as an owner, employee, independent contractor or otherwise) of [her] contractual obligations under this Agreement." Keil further agreed that Sunbit may, with or without prior notice to her, notify third parties

10

of her agreements and obligations under the Agreement, and that she would respond to Sunbit in writing regarding the status of her employment or proposed employment with any party during the Restriction Period.

40. Under Section 7 of the Agreement, Keil agreed that for twelve months following termination, she would not "directly or indirectly, solicit any of the Company's employees or consultants to terminate their relationship with the Company."

41. Under Section 11(f) of the Agreement, Keil acknowledged and agreed that:

> [V]iolation of this Agreement by [her] may cause the Company irreparable harm, and therefore [she] agree[d] that the Company will be entitled to seek extraordinary relief in court, including, but not limited to, temporary restraining orders, preliminary injunctions and permanent injunctions without the necessity of posting a bond or other security (or, where such a bond or security is required, . . . a $1,000 bond will be adequate), in addition to and without prejudice to any other rights or remedies that the Company may have for a breach of this Agreement.

42. The non-compete, confidentiality, and non-solicitation provisions in the Employment Letter and Agreement were reasonably necessary to protect the legitimate business interests of Sunbit, including the protection of trade secrets and valuable confidential business or professional information that otherwise does not qualify as trade secrets.

43. Sunbit's legitimate business interests include: (a) trade secrets, as defined in Fla. Stat. § 688.002(4); (b) valuable confidential business or professional information

11

that otherwise does not qualify as trade secrets; (c) substantial relationships with specific prospectively or existing providers/customers or patients; and (d) provider/customer or patient goodwill associated with an ongoing business or a specific geographic location, marketing, or trade area. § 542.335(1)(b)(1)-(4), Fla. Stat.

## D. Keil's Departure and Competing Employment with Synchrony/CareCredit

44. Keil resigned from her employment with Sunbit on February 20, 2026. In connection with her departure, Sunbit requested Keil to return the Termination Certification, but that request was ignored.

45. Sunbit's subsequent investigation revealed that, following her resignation, Keil started or imminently intended to start working for CareCredit, a consumer financing platform owned and operated by Synchrony, in a substantively similar position to that which she held at Sunbit, within the same geographical region.

46. Sunbit learned that Keil's former CareCredit manager maintained active communications with Keil during her employment at Sunbit. Upon information and belief, CareCredit actively recruited Keil to return to its employ, knowing that she possessed intimate knowledge of Sunbit's business operations, strategies, and Confidential Information for the competitive southeast region.

47. Upon information and belief, Keil also provided Synchrony/CareCredit with the names of multiple other top-performing team members to recruit.

48. Because of these actions, Sunbit was required to retain counsel to address Keil's conduct and competing employment.

12

49. On March 13, 2026, Sunbit, through its counsel, sent Keil an immediate cease and desist letter demanding that she cease and desist from her violations of the Employment Letter and Agreement, including her non-competition, confidentiality, and non-solicitation obligations (the "Cease and Desist Letter"). A true and correct copy of the Cease and Desist Letter is attached hereto as **Exhibit 4**.

50. On March 17, 2026, counsel for Synchrony, the law firm of McGuireWoods LLP, contacted Sunbit's counsel and identified itself as representing Synchrony in connection with the Cease and Desist Letter that Synchrony had received directly from Keil. This confirmed that Synchrony was aware of and directly involved in hiring Keil.

51. Through counsel, Sunbit and Synchrony began to engage in discussions to resolve the issues raised in the Cease and Desist Letter, participating in calls on March 17, 19, and 20, 2026.

52. Keil used a separate business line on her personal phone for Sunbit business, and that business line is still active on her phone, meaning that Sunbit's Confidential Information was still present on her phone as she began working for Synchrony/CareCredit.

53. While counsel for Synchrony represented that Keil would not be working until the issues were resolved between the parties, Synchrony delayed in providing direct information requested about Keil's new role within Synchrony/CareCredit, refused to answer certain repeated questions about that role, and provided information with unclear language that required repeated clarification.

54. On March 19, 2026, Keil finally signed the requested Termination Certification, in which she certified that she did not have in her possession, nor had she failed to return, any Company property or documents, and she acknowledged her continuing obligations under the Agreement. However, as Keil continued to possess Confidential Information on her personal phone, this certification was not accurate.

55. Despite representing that it would provide information about Keil's job description with Synchrony/CareCredit by March 23, 2026, at the latest, by that date, Synchrony still had not provided a job description or even job title.

56. On March 24, 2026, a week after the initial call, Synchrony's counsel provided that Keil's "prospective role" at Synchrony/CareCredit would be as a "VP, Enrollment & Messaging" in the general Health & Wellness space, stating that it was "not dental-specific, not customer-facing, and not specific to the company's Florida operations." Such representations left Sunbit with many continuing questions, as it was unclear whether Keil had already started working in a different role and whether the role had been adjusted. Further, Synchrony's representations that the role was not "specific" to dental or Florida and not "customer-facing" do not indicate that the role does not include dental, Florida, and the healthcare providers central to Sunbit's business.

57. As a result, on March 25, 2026, Sunbit requested very specific information about Keil's position with Synchrony/CareCredit, including the original job posting, original posting date, original job description, original and actual start date, and details about modifications to her position, job description, start date, and

14

reporting structure.  Sunbit reserved all rights and noted that if the information could not be provided, it would need to move on to enforcing its remedies in court.

58.    On March 26, 2026, counsel for Synchrony provided a formal written description for Keil's "prospective[]" position, without answering any of the other questions.  A true and correct copy of that written description is attached hereto as **Exhibit 5**.

59.    Despite Sunbit's cease and desist demands, Synchrony/CareCredit continued to pursue Keil's employment in a position that directly competes with Sunbit's business.    The "VP, Enrollment & Messaging" position at Synchrony/CareCredit is responsible for, among other things, leading the strategy, operations, and commercial alignment of provider onboarding, activation readiness, and provider-facing communication across the Health & Wellness platform. The role involves driving growth outcomes by ensuring providers receive clear, consistent, and compliant guidance throughout the enrollment, activation, and re-engagement lifecycle.

60.    Both Keil's role at Sunbit and the proposed role at Synchrony/CareCredit fundamentally focus on increasing product usage among healthcare providers; ensuring providers and their staff understand how to offer and market the products effectively; identifying gaps and driving improvement in these processes, provider experience and knowledge, and growth; and working cross-functionally with internal teams to improve provider performance and engagement. The proposed position at Synchrony/CareCredit appears to be essentially the exact

position that Keil had at Sunbit but at an increased seniority level.

61. Despite notice of Keil's contractual obligations, Synchrony/CareCredit persisted in their plans to employ Keil. On information and belief, Synchrony/CareCredit offered Keil a position at a higher level and with superior compensation specifically to induce her to leave Sunbit and bring her knowledge of Sunbit's trade secrets and Confidential Information to Synchrony's CareCredit business.

62. It is undisputed that Keil used her personal mobile phone device to conduct Sunbit business during her employment, accessing Sunbit email, contacts, calendars, and other Confidential Information on that device. Upon information and belief, Keil's device continues to contain Sunbit's Confidential Information, including cached emails, contacts, calendar entries, notes, documents, and other data.

63. Despite repeated discussion between counsel regarding the forensic examination and remediation of Keil's personal device, Sunbit's Confidential Information has still not been deleted from Keil's device. While Synchrony's counsel has acknowledged that Keil's device should be imaged, it has resisted Sunbit's proposed scope for the search and deletion process thus far, and the parties have not been able to agree on search protocols.

64. Counsel for Sunbit has engaged in discussions with counsel for Synchrony to resolve these issues between March 17, 2026 and the present, and has proposed solutions to resolve the non-compete violations and confidentiality concerns, but despite diligent efforts to satisfy these concerns outside of litigation, and repeated

references to the need to move expediently to preserve litigation options, these issues remain unresolved.

65.     In light of Keil's non-competition violations and the similarity of her roles at Sunbit and Synchrony/CareCredit, Sunbit is extremely concerned that Keil has violated or is in imminent risk of violating her confidentiality and non-solicitation obligations and/or is using or disclosing Sunbit's Confidential Information and/or trade secrets in connection with her work for CareCredit and Synchrony.

66.     Sunbit's concerns extend beyond Florida, particularly given the detailed Confidential Information and trade secrets Keil possessed about the southeast region and Sunbit's business strategies within the 2026-2027 time frame.

67.     Left unchecked, further use, disclosure, or exploitation of Sunbit's trade secrets and Confidential Information—whether for Keil's own benefit or for the benefit of Synchrony and CareCredit, one of Sunbit's direct competitors in the healthcare consumer financing industry—will cause Sunbit irreparable harm for which there is no adequate remedy at law.

68.     Keil's, Synchrony's, and CareCredit's conduct constitutes a violation of the Federal Defend Trade Secrets Act, the Florida Uniform Trade Secrets Act, and a breach of Keil's contractual obligations to Sunbit.  This unlawful conduct has and will continue to severely and negatively impact Sunbit's legitimate business interests. Sunbit therefore seeks preliminary and permanent injunctive relief against all Defendants to prevent further irreparable harm from occurring for which there is no adequate remedy at law.

69.     Furthermore, a temporary restraining order is appropriate as Defendants continue to delay the resolution of these issues and provide only limited information while Keil continues to possess Confidential Information.  Defendants refuse to clarify important details about Keil's directly competitive position, and counsel for Synchrony has repeatedly suggested that it may move forward with imaging and deleting information from Keil's personal phone imminently without agreement on the details by Sunbit, including in the most recent correspondence on April 6, 2026, wherein counsel stated that "regardless" of whether their suggestions on search protocols were workable, "we need to move forward with getting the device imaged."

### E.     Synchrony/CareCredit's Knowledge of and Participation in the Misappropriation

70.     Synchrony, through its product and subsidiary CareCredit, is a direct competitor of Sunbit in the healthcare consumer financing space.  Sunbit and CareCredit compete for the same healthcare providers, the same patients, and their usage of financing products.

71.     On information and belief, Synchrony/CareCredit knew or should have known, at the time it sought to hire Keil, that Keil had been employed by Sunbit—a direct competitor—in a senior key account management position with extensive access to Sunbit's trade secrets and Confidential Information.

72.     At no later than March 17, 2026, Synchrony/CareCredit, through counsel, had actual knowledge of Keil's contractual obligations to Sunbit, including her non-competition, confidentiality, and non-solicitation obligations under the

Employment Letter and the Agreement.

73.     Despite this knowledge, Synchrony/CareCredit continued to pursue Keil's employment in a competing role.   While Synchrony represented through counsel that it temporarily suspended Keil from working in any capacity after receiving Sunbit's cease and desist letter, Synchrony/CareCredit have refused to abandon their plan to employ Keil in a position that competes with Sunbit and have refused to answer clarifying questions about the position.

74.     Synchrony's counsel has characterized the proposed "VP, Enrollment & Messaging" position as "internal" and "not dental-specific," but the essential responsibilities of that position—including leading strategy and performance of provider onboarding, driving messaging strategy and delivery across provider communications, collaborating with Sales leadership to align enrollment to commercial priorities, and championing a frictionless provider experience—are substantively identical to the functions Keil performed at Sunbit.

75.     By hiring Keil in a competing role, despite actual knowledge of her contractual obligations to Sunbit, Synchrony/CareCredit have knowingly and intentionally induced, or are actively inducing, Keil to breach her contractual obligations, including the covenant not to compete and the confidentiality provisions of the Employment Letter and Agreement.

**COUNT I – DEFEND TRADE SECRETS ACT (18 U.S.C. § 1836, *et seq.*)**
**(Against Keil, Synchrony, and CareCredit)**

76.     Sunbit repeats and realleges paragraphs 1 through 75, as if fully set forth

19

herein.

77.     The federal DTSA forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." *See* 18 U.S.C. § 1836, *et seq.*

78.     "Trade secrets" are broadly defined under the DTSA to include "all forms and types of financial, business, scientific, technical, economic or engineering information."

79.     Sunbit owns and possesses certain confidential, proprietary, and trade secret information, as alleged and described above.  This confidential, proprietary, and trade secret information relates to services that are used, sold, and/or ordered in, or that are intended to be used, sold, and/or ordered in, interstate or foreign commerce.

80.     Sunbit derives independent economic value from the fact that its confidential, proprietary, and trade secret information is not generally known to the public and not readily ascertainable through proper means.  Sunbit has taken, and continues to take, reasonable measures to keep that information secret and confidential.  These measures include, but are not limited to, password-protecting this information, limiting the dissemination of information to certain employees, promulgating policies governing access to and the handling and use of such information, requiring its employees to comply with its IT Acceptable Use Statement, and entering into Confidential Information and Invention Assignment Agreements with employees.

81.     At the outset of their employment, Sunbit requires employees to sign a

Confidential Information and Invention Assignment Agreement that includes nondisclosure and confidentiality provisions that survive the termination of their employment relationship with Sunbit. Sunbit also requires its employees to comply with its policies and procedures related to the handling of confidential, nonpublic, or sensitive information, as set forth in its Employee Handbook and IT Acceptable Use Statement.

82.    During Keil's employment with Sunbit, she had access and exposure to, and utilized, confidential and proprietary information that constituted Sunbit's trade secrets. As described above, this included, but was not limited to, existing, upcoming, and prospective merchant lists; product pricing, features, and performance data; major business initiatives; sales and marketing strategies; customer account information; pricing methodologies; and competitive intelligence. Keil still possessed Confidential Information on her personal device after she was hired by Synchrony/CareCredit.

83.    Without Sunbit's consent, Defendants misappropriated or threaten to misappropriate Plaintiff's confidential, proprietary, and trade secret information in an improper and unlawful manner as alleged herein, and thereby committed one or more acts of actual or threatened misappropriation of trade secrets within the meaning of the DTSA. By hiring Keil to perform a substantively identical role at a direct competitor, Defendants knew or had reason to know that Keil's knowledge of Sunbit's trade secrets would inevitably be used or disclosed in the course of that competing employment.

84.    Defendants' conduct as alleged above constitutes misappropriation or

threatened misappropriation of Sunbit's trade secrets under the DTSA.

85.     As a direct and proximate result of Defendants' conduct, Sunbit has suffered, and if the conduct is not enjoined, will continue to suffer, harm.

86.     Sunbit has no adequate remedy at law, and Defendants' violations cannot be remedied by money damages alone.

87.     Due to Defendants' unlawful conduct, Sunbit is entitled to an injunction based on actual and threatened misappropriation as set forth in 18 U.S.C. § 1836(b)(3)(A)(i).

88.     Further, due to the irreparable harm that Sunbit has suffered and will continue to suffer as a result of Defendants' unlawful actions, Sunbit is entitled to a preliminary and permanent injunction (a) prohibiting Defendants from (i) any further acquisition, use, or disclosure of Sunbit's confidential, proprietary, and trade secret information, (ii) offering or providing any services developed, designed, or improved through the use of Sunbit's trade secrets, and (iii) employing Keil in any capacity that competes with Sunbit's business within the State of Florida; and (b) ordering the disgorgement and the immediate return of all of Sunbit's Confidential Information and trade secrets in Defendants' possession, custody, or control.

89.     Sunbit requests that the Court take affirmative action to protect its trade secrets, as set forth in 18 U.S.C. § 1836(b)(3)(A)(ii), including by ordering the forensic inspection of Keil's personal mobile device, computers, electronic storage devices, email accounts, cloud-based storage accounts, and any other devices or accounts that may contain Sunbit's trade secrets, to determine the extent, if any, that Sunbit's trade

secrets were wrongfully retained, used, and/or disseminated to others.

90.    Defendants' misappropriation and disclosure of Sunbit's trade secrets entitles Sunbit to monetary damages, attorneys' fees, and costs, as provided in 18 U.S.C. § 1836(b)(3)(B).

WHEREFORE, Plaintiff Sunbit, Inc. respectfully requests that the Court grant a preliminary and permanent injunction, as defined below; enter a judgment against Defendants Kathie Keil, Synchrony Financial, and CareCredit LLC for damages, including compensatory damages in an amount to be determined at trial, costs, interest, and attorneys' fees as permitted by law; and provide for such other and further relief as the Court deems just and proper.

### COUNT II – FLORIDA UNIFORM TRADE SECRETS ACT (Fla. Stat. § 688.001, *et seq*.)
### (Against Keil, Synchrony, and CareCredit)

91.    Sunbit repeats and realleges paragraphs 1 through 75, as if fully set forth herein.

92.    Sunbit's confidential, proprietary, and trade secret information includes, but is not limited to, existing, upcoming, and prospective merchant lists; product pricing, features, and performance data; major business initiatives; sales and marketing strategies; customer account information; pricing methodologies and cost data; business plans; financial forecasts and historical financial data; and competitive intelligence.

93.    Sunbit has invested significant time, effort, and resources to develop its confidential, proprietary, and trade secret information.

23

94.    Sunbit derives independent economic value from the fact that its confidential, proprietary, and trade secret information is not generally known to the public and not readily ascertainable through proper means.  Sunbit has taken, and continues to take, reasonable measures to keep that information secret and confidential.  These measures include, but are not limited to, password-protecting this information, limiting the dissemination of information to certain employees, promulgating policies governing access to and the handling and use of such information, requiring its employees to sign Confidential Information and Invention Assignment Agreements, and monitoring access to its information systems.

95.    At the outset of their employment, Sunbit requires employees to sign a Confidential Information and Invention Assignment Agreement that includes nondisclosure and confidentiality provisions that survive the termination of their employment relationship with Sunbit.  Sunbit also requires its employees to comply with its policies and procedures related to the handling of confidential, nonpublic, or sensitive information.

96.    During Keil's employment with Sunbit, she had access and exposure to, and utilized, confidential and proprietary information that constituted Sunbit's trade secrets.  As described above, this included, but was not limited to, existing, upcoming, and prospective merchant lists; product pricing, features, and performance data; major business initiatives; sales and marketing strategies; customer account information; and competitive intelligence.  Keil still possessed Confidential Information on her personal device after she was hired by Synchrony/CareCredit.

97. Sunbit's confidential, proprietary, and trade secret information provides it with competitive advantages that, if known, would provide commercial or economic value from their disclosure to or use by others.

98. Keil was well aware that Sunbit treated its merchant lists, product pricing, business strategies, customer information, and other confidential information as trade secrets.

99. At all relevant times, Keil had a duty to maintain the secrecy of Sunbit's trade secrets. However, in violation of this duty and applicable law, Keil has, upon information and belief, retained and potentially disclosed or used that information for the benefit of Synchrony and CareCredit, and by doing so has misappropriated Sunbit's trade secrets.

100. Synchrony/CareCredit, with knowledge of Keil's obligations to Sunbit and knowledge that Keil possessed Sunbit's trade secrets, hired or seeks to hire Keil in a role that would inevitably require the use or disclosure of Sunbit's trade secrets, thereby acquiring Sunbit's trade secrets through improper means.

101. Defendants' conduct as alleged above constitutes misappropriation of Sunbit's trade secrets under the Florida Uniform Trade Secrets Act, Fla. Stat. § 688.001, *et seq*. (the "FUTSA").

102. Sunbit has no adequate remedy at law, and Defendants' violations cannot be remedied by money damages alone.

103. Due to the irreparable harm that Sunbit has suffered and will continue to suffer as a result of Defendants' unlawful actions, Sunbit is entitled to a preliminary

and permanent injunction (a) prohibiting Defendants from (i) any further acquisition, use, or disclosure of Sunbit's confidential, proprietary, and trade secret information, (ii) offering or providing any services developed, designed, or improved through the use of Sunbit's trade secrets, and (iii) employing Keil in any capacity that competes with Sunbit's business within the State of Florida; and (b) ordering the disgorgement and the immediate return of all of Sunbit's Confidential Information and trade secrets in Defendants' possession, custody, or control.

104.   Based on the foregoing allegations, Sunbit is entitled to recover from Defendants all monetary damages sustained as a result of the misappropriation, including the actual loss caused by the misappropriation and any unjust enrichment to Defendants stemming from the wrongful acquisition and use of Sunbit's valuable trade secrets.

105.   Sunbit has been required to retain the services of an attorney to prosecute this action and therefore is entitled to an award of reasonable attorneys' fees and costs incurred herein.

WHEREFORE, Plaintiff Sunbit, Inc. respectfully requests that the Court grant a preliminary and permanent injunction, as defined below; enter a judgment against Defendants Kathie Keil, Synchrony Financial, and CareCredit LLC for damages, including compensatory damages in an amount to be determined at trial, costs, interest, and attorneys' fees as permitted by law; and provide for such other and further relief as the Court deems just and proper.

26

## COUNT III – BREACH OF CONTRACT
### (Against Keil)

106. Sunbit repeats and realleges paragraphs 1 through 75, as if fully set forth herein.

107. The Employment Letter and incorporated Agreement between Sunbit and Keil are valid and binding contracts for which Keil received adequate consideration, including her employment with Sunbit and the compensation paid to her thereunder.

108. Sunbit has performed all of its obligations under the Employment Letter and Agreement, and Defendant Keil has not been excused from performing her obligations.

109. The Employment Letter prohibits Keil, for a period of one year following the termination of her employment, from engaging in any business activity within the State of Florida that competes with Sunbit.

110. The Agreement prohibits Keil from disclosing, using, or retaining Sunbit's Confidential Information during or after her employment, and requires Keil to return all Company property and documents upon termination.

111. The Agreement further prohibits Keil from soliciting Sunbit's employees and consultants for a period of twelve months following the termination of her employment.

112. The Agreement further requires Keil to inform any entity or person with whom she seeks to enter into a business relationship of her contractual obligations to

27

Sunbit during the Restriction Period.

113.    Keil breached the Employment Letter and Agreement by, among other things: (a) engaging in business activity within the State of Florida that competes with Sunbit by accepting or seeking employment with Synchrony/CareCredit in a competing role during the one-year non-competition period; (b) upon information and belief, disclosing, using, or retaining Sunbit's Confidential Information in connection with her work for Synchrony/CareCredit; and (c) failing to comply with her obligations to return all Company property and documents and Confidential Information.

114.    Sunbit has no adequate remedy at law, and Keil's violations cannot be remedied by money damages alone.

115.    Due to the irreparable harm that Sunbit has suffered and will continue to suffer as a result of Keil's breach, Sunbit is entitled to a preliminary and permanent injunction prohibiting Keil from (i) any further use or disclosure of Sunbit's confidential, proprietary, and trade secret information, and (ii) working in any capacity that competes with Sunbit's business within the State of Florida.  *See* § 542.335(1)(i), Fla. Stat.

116.    As a direct and proximate result of Keil's breach of the Employment Letter and Agreement, Sunbit has suffered and will continue to suffer damages.

117.    Sunbit has been required to retain the services of an attorney to prosecute this action and therefore is entitled to an award of reasonable attorneys' fees and costs incurred herein.  *See* § 542.335(1)(k), Fla. Stat.

WHEREFORE, Plaintiff Sunbit, Inc. respectfully requests that the Court grant a preliminary and permanent injunction, as defined below; enter a judgment against Defendant Kathie Keil for damages, including compensatory damages in an amount to be determined at trial, costs, interest, and attorneys' fees as permitted by law; and provide for such other and further relief as the Court deems just and proper.

## COUNT IV – TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Synchrony and CareCredit)

118.  Sunbit repeats and realleges paragraphs 1 through 75, as if fully set forth herein.

119.  There existed valid and binding contracts between Sunbit and Keil, namely the Employment Letter and the Agreement, which contain enforceable restrictive covenants, including a covenant not to compete, confidentiality obligations, and non-solicitation provisions.

120.  At no later than March 17, 2026, Synchrony/CareCredit had actual knowledge of the existence of these contracts and the restrictive covenants contained therein.

121.  Despite this knowledge, Synchrony/CareCredit intentionally and unjustifiably interfered with Sunbit's contractual rights by hiring or seeking to hire Keil in a role that Synchrony/CareCredit knew, or should have known, would require Keil to breach her non-competition and confidentiality obligations to Sunbit.

122.  Synchrony/CareCredit's interference was intentional and without justification or privilege.  Synchrony and CareCredit are direct competitors of Sunbit

29

in the healthcare consumer financing space and acted with the intent to procure a breach of Sunbit's contractual rights by hiring a Sunbit employee with extensive knowledge of Sunbit's trade secrets, business strategies, and customer relationships.

123.   Synchrony's characterization of Keil's proposed position as "internal" and "not dental-specific" does not eliminate the competitive overlap. As detailed above, the essential responsibilities of the "VP, Enrollment & Messaging" position are substantively identical to the functions Keil performed at Sunbit, and Synchrony and CareCredit compete with Sunbit in the Health & Wellness space, including in Florida.

124.   As a direct and proximate result of Synchrony/CareCredit's tortious interference with the contracts between Sunbit and Keil, Sunbit has suffered and will continue to suffer damages.

WHEREFORE, Plaintiff Sunbit, Inc. respectfully requests that the Court enter a judgment against Defendants Synchrony Financial and CareCredit LLC for damages, including compensatory damages in an amount to be determined at trial, costs, interest, and attorneys' fees as permitted by law; and provide for such other and further relief as the Court deems just and proper.

### COUNT V – DECLARATORY JUDGMENT (28 U.S.C. § 2201)
### (Against Keil, Synchrony, and CareCredit)

125.   Sunbit repeats and realleges paragraphs 1 through 75, as if fully set forth herein.

126.   This is an action for declaratory judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201.

127. An actual, present, and justiciable controversy exists between Sunbit, on the one hand, and Defendants, on the other, regarding the validity, enforceability, and scope of the restrictive covenants contained in the Employment Letter, and whether Defendants' conduct constitutes a violation thereof.

128. The controversy is ripe for adjudication. Keil resigned from Sunbit on February 20, 2026, triggering the one-year non-competition period under Section 9 of the Employment Letter and the Restriction Period under the Agreement. Synchrony/CareCredit has hired or seeks to hire Keil in the VP, Enrollment & Messaging role, and Defendants have refused to abandon their plan to proceed with that employment despite Sunbit's cease and desist demands.

129. Defendants have taken the position—through counsel—that the proposed VP, Enrollment & Messaging role is "not dental-specific, not customer-facing, and not specific to the company's Florida operations" and that the role is "internal, focused on overseeing the development of internal processes to enable customer-facing personnel to service existing customer accounts." Defendants have further characterized the role as a "nationwide position with internal focus" that purportedly does not involve "soliciting new business or directing others to solicit new business."

130. Sunbit disputes Defendants' characterization. As alleged in detail above, the essential responsibilities of the VP, Enrollment & Messaging position—including leading the strategy, execution, and performance of provider onboarding and activation; driving messaging strategy and delivery across provider communications;

31

partnering with Sales leadership to align enrollment and messaging workflows to commercial priorities; and championing a frictionless provider experience—are substantively identical to the functions Keil performed at Sunbit as Senior and Regional Key Account Manager.

131.  The VP, Enrollment & Messaging position broadly matches the "VP, Sales Enrollment & Messaging" positions that Synchrony recently posted online in a number of geographic regions, and those positions appeared to be region-specific. Upon information and belief, Keil will be based in and working from the State of Florida, and the region she is responsible for at Synchrony/CareCredit includes Florida.

132.  The covenant not to compete in Section 9 of the Employment Letter prohibits Keil, for a period of one year following her termination, from engaging in "any business activity within the State of Florida which competes with the Company." The fact that Synchrony has characterized the role as "internal" or "not dental-specific" does not place the role outside the scope of the covenant.  The covenant does not require that Keil hold the identical title or perform the identical duties she held at Sunbit; it prohibits her from engaging in any business activity in Florida that competes with Sunbit.  Working for Sunbit's direct competitor in the healthcare consumer financing space—in a role whose core functions mirror those Keil performed at Sunbit—constitutes business activity that competes with Sunbit, regardless of whether the role is labeled "internal" or spans multiple verticals beyond dental.

133.  Defendants' position that the proposed role does not involve soliciting

Sunbit's Florida clients does not remove it from the scope of the non-compete. The covenant is not limited to client-facing sales activity; it prohibits "any business activity . . . which competes with the Company." Provider onboarding, activation, messaging, and re-engagement are core competitive business activities in the consumer financing industry—they are the very activities through which companies like Sunbit and CareCredit compete for the utilization, loyalty, and engagement of healthcare providers.

134. Similarly, the representation that the role is a "nationwide" position does not remove it from the geographic scope of the covenant. Keil resides in Florida, will be working from Florida, and the activities she performs in the VP, Enrollment & Messaging role will constitute business activity that competes with Sunbit within the State of Florida.

135. The restrictive covenants in the Employment Letter and the Agreement are valid, enforceable, and supported by adequate consideration under Florida law. Fla. Stat. § 542.335(1)(b) provides that a restrictive covenant is enforceable if it is set forth in a writing signed by the person against whom enforcement is sought—here, Keil signed the Employment Letter.

136. Under Fla. Stat. § 542.335(1)(d), a court presumes that a restrictive covenant with a duration of more than two years is unreasonable in time. The one-year non-competition period falls well outside the statutory presumption of unreasonableness.

137. Under Fla. Stat. § 542.335(1)(c), the person seeking enforcement of a

restrictive covenant need only establish the existence of one or more legitimate business interests justifying the covenant.  Sunbit's legitimate business interests include: (a) trade secrets, as defined in Fla. Stat. § 688.002(4); (b) valuable confidential business or professional information that otherwise does not qualify as trade secrets; (c) substantial relationships with specific prospectively or existing providers/customers or patients; and (d) provider/customer or patient goodwill associated with an ongoing business or a specific geographic location, marketing, or trade area.  § 542.335(1)(b)(1)-(4), Fla. Stat.

138.   Under Fla. Stat. § 542.335(1)(g)(1), a court "shall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought."

139.   Sunbit is entitled to a judicial declaration that: (a) the restrictive covenant in Section 9 of the Employment Letter is valid and enforceable under Florida law, including Fla. Stat. § 542.335; (b) Keil's employment in the VP, Enrollment & Messaging role at Synchrony/CareCredit constitutes a violation of the covenant not to compete in Section 9 of the Employment Letter; and (c) Synchrony/CareCredit's hiring of Keil in a competing role, with knowledge of her restrictive covenants, constitutes conduct that has caused and will cause Keil to breach those covenants.

140.   A judicial declaration is necessary and appropriate to settle the rights, status, and legal relations of the parties, to remove the uncertainty and insecurity arising from Defendants' stated position that the proposed employment does not violate the restrictive covenants, and to prevent further irreparable harm to Sunbit.

Such a declaration will serve a useful purpose in clarifying the parties' obligations, guiding Defendants' future conduct, and avoiding a multiplicity of future legal proceedings.

141.    This issue is ripe for this Court to decide, and all parties who have, or may have, an interest in this declaration have been included as parties to this action.

142.    This Court has the authority to adjudicate and declare the rights and legal relationships of the parties to this action, and any opinion rendered in this matter would not amount to solely an advisory opinion.

WHEREFORE, Plaintiff Sunbit, Inc. respectfully requests that the Court enter a declaratory judgment against Defendants Kathie Keil, Synchrony Financial, and CareCredit LLC as defined below and provide for such other and further relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Sunbit, Inc. requests that judgment be entered against Defendants Kathie Keil, Synchrony Financial, and CareCredit LLC, as follows:

A.    For equitable and injunctive relief to:

    i.    Enjoin Defendants and those acting in concert or participation with them from, directly or indirectly, copying, transferring, using, or disclosing Sunbit's confidential, proprietary, and trade secret information;

    ii.    Enjoin Keil from engaging in any business activity within the State of Florida that competes with Sunbit, including employment with

Synchrony or CareCredit in any capacity that competes with Sunbit's business, for the duration of the non-competition period;

iii. Enjoin Synchrony/CareCredit from employing Keil in any position that competes with Sunbit's business within the State of Florida for the duration of the non-competition period;

iv. Require Defendants to immediately return any and all property of Sunbit, including but not limited to: (i) all of Sunbit's confidential, proprietary, and trade secret information; (ii) all external storage devices and cloud accounts containing Sunbit's Confidential Information; and (iii) all copies, backups, and duplicates of Sunbit's electronic data;

v. Permit the independent verification by a neutral forensic expert that all confidential, proprietary, and trade secret information of Sunbit has been deleted from Keil's personal mobile device, email accounts, electronic storage accounts, computers, and other electronic devices;

vi. Require Defendants to preserve and not destroy any and all evidence relating to this matter, including, but not limited to, documents and/or communications (including any emails, texts, or other messages) concerning (a) Keil's employment with or work for Sunbit; (b) Keil's contacts and dealings with any of Sunbit's merchants, customers, or potential customers; (c) Keil's

acquisition, disclosure, use, or possession of any of Sunbit's Confidential Information or trade secrets; (d) any communications between Keil and Synchrony or CareCredit concerning Sunbit; and (e) any communications internal to Synchrony or CareCredit concerning Keil's employment;

B.    For compensatory damages associated with Defendants' unlawful actions;

C.    For costs, interest, and attorneys' fees incurred herein, as appropriate;

D.    For a declaratory judgment pursuant to 28 U.S.C. § 2201 declaring that: (a) the restrictive covenants in Section 9 of the Employment Letter are valid and enforceable under Florida law, including Fla. Stat. § 542.335; (b) Keil's employment in the VP, Enrollment & Messaging role at Synchrony/CareCredit constitutes a violation of the covenant not to compete; and (c) Synchrony/CareCredit's hiring of Keil in a competing role, with knowledge of her restrictive covenants, constitutes conduct that has caused and will cause Keil to breach those covenants; and

E.    For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all issues so triable.

Dated: April 20, 2026

Respectfully submitted,


By: */s Elizabeth C. DeGori*
Elizabeth C. DeGori, FBN 1045092
DENTONS US LLP
1 Alhambra Plaza, Penthouse
Coral Gables, Florida 33134
Telephone: (305) 390-4635
elizabeth.degori@dentons.com
*Counsel for Plaintiff Sunbit, Inc.*

## VERIFICATION

I, Yaron Ozer, pursuant to 28 U.S.C. § 1746, hereby state that I am the Director, Dental Field Operation of Sunbit Now, LLC, which is a wholly owned subsidiary of Sunbit, Inc. I am authorized to make this verification on behalf of Sunbit, Inc. in the foregoing action. I have personal knowledge of the statements made in the foregoing Verified Complaint and those statements are true and correct to the best of my knowledge, information, and belief. I verify under penalty of perjury that the foregoing is true and correct.

Executed on April 20, 2026.

Yaron Ozer